THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES WILLIAMS, Defendant-Appellant.

First District (5th Division ) No. 55281

Opinion filed February 27, 1976.

James J. Doherty, Public Defender, of Chicago (John T. Moran, Jr., Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney of Chicago (Kenneth L. Gillis and Patrick Delphino, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BARRETT delivered the opinion of the court:

Defendant was indicted for the crime of murder. (Ill. Rev. Stat. 1965, ch. 38, par. 9—1.) Following a bench trial, defendant was found guilty and sentenced to a term of not less than 50 nor more than 75 years in the Illinois State Penitentiary.

On November 30, 1973, this court dismissed defendant's appeal pur-

suant to Supreme Court Rule 606(a) and (b) (Ill. Rev. Stat. 1971, ch. 110A, par. 606), for failure to file a timely notice of appeal. (*People v. Williams,* 16 Ill. App. 3d 111, 305 N.E.2d 583.) On November 27, 1974, our Supreme Court reversed and remanded the instant case to this court with directions to consider the appeal on its merits. *People v. Williams,* 59 Ill. 2d 243, 320 N.E.2d 13.

On appeal, defendant raises only one issue for this court's consideration: whether the references of a medical expert for the State to a toxicologist's report upon which the expert based his opinion that the deceased died as a result of asphyxiation, and not as the result of stab wounds, prejudiced defendant's case, was inadmissible hearsay, and denied defendant his right of confrontation.

Because the Supreme Court remanded this cause to this court with directions to consider the appeal on its merits and because the trial evidence was not a part of either of the above opinions, we deem it advisable to consider all of the evidence in this opinion.

The testimony at trial disclosed the following occurrences.

John Matunas, a police officer for the City of Chicago, testified that on March 11, 1967, while on duty, he observed a vehicle parked near 130th and the Calumet Expressway in Chicago; that upon approaching the vehicle and opening the driver's door, he found a person sitting behind the wheel. The automobile was burned inside and the occupant appeared to be dead. A two-gallon can containing some gasoline was removed from the back seat and taken to the crime lab. He also removed certain garments worn by the victim. On cross-examination, Officer Matunas testified that the temperature was very cold outside and that there were tire ruts at least two or three inches deep which were frozen solid. He stated that he observed an unsmoked cigarette and a burned match in the left-hand corner of the floor, as well as an unlit book of matches in the back seat of the vehicle. He identified a black and white checkered sport coat and an outer coat and stated that neither garment possessed any punctures, holes or slashes in the left front portion. He testified that upon opening the automobile door there was excessive heat in its interior, and that upon removing the deceased from the vehicle he observed that he was severely burned. On redirect examination, the witness stated that the odor he smelled in the can obtained was gasoline and that a sweater removed from the victim contained approximately seven puncture or tear marks.

L. G. Gamble testifying for the State stated that Arthur Pearson, the victim found in the automobile, was his cousin, and that he, Pearson, and Joe Lewis, were together on the late evening hours of March 10, 1967, and the early morning hours of March 11, 1967; that Pearson had

been drinking a considerable amount during that period of time. Approximately at midnight, 10 or 12 persons, 19 to 20 years of age, grabbed Pearson and began kicking him. Both Lewis and Gamble then ran away and left Pearson remaining on the street. He testified that he saw no knives in the hands of any of the persons making the assault. That was the last time he saw Pearson alive.

On cross-examination he testified that it was dark at the place where the altercation and kicking occurred, but that the attackers were considerably younger than defendant. The assaulters asked Pearson for money. He stated that while he was defending himself against an attacker, he was not able to see everything other attackers were doing to Pearson prior to his running from the scene of the occurrence.

Lucille Thomas, manager of a tavern, was the next witness for the State. She stated that she knew defendant and Pearson by sight in March, 1967, and that she had seen the two together on different occasions. On cross-examination she indicated that on March 10, 1967, she observed a disturbance occurring at 43rd and Cottage Grove, two blocks from her place of business; that people were shouting and hollering and milling about. She did not approach the scene of the disturbance and, other than hearing the noise of the disturbance, did not know whether or not a fight was occurring. She reiterated that although she had seen defendant and Pearson together previously, she could not indicate when or where she had observed them.

George Gibson, life insurance agent for Abraham Lincoln Life Insurance Company, testified on behalf of the State. On March 1, 1967, he sold a whole life insurance policy to Charles Williams in the amount of $1,000. Charles Williams was the insured on the policy and Mary Williams was the beneficiary. On cross-examination, Gibson stated that he did not recall the exact date on which the application for the policy was signed. He knew defendant for approximately one year before taking the application and defendant had no other previous insurance policies issued through Gibson. On the day on which Williams took out the policy, Gibson was not solicited by Williams, but rather just happened to visit defendant's residence.

The next witness called by the State was Seymour Cohen, an insurance agent for Mayflower Life of North America. He stated that he sold a policy to a person by the name of Charles Williams but did not recognize defendant in court as the person to whom he sold the policy. He identified the policy as a $1,000 life insurance policy and the insured as Charles Williams.

Detective Charles Smith of the Homicide Unit, Chicago Police Department, then testified on behalf of the State. On March 11, 1967, he

went to 1200 East 130th Street and observed an automobile with a person apparently dead sitting behind the wheel. The deceased was removed from the automobile, a search of his person was conducted and various articles were found. A red wallet was recovered from the deceased's right, rear pocket. An inventory of the contents of the wallet disclosed a bond slip with the name Charles Williams on it, a vehicle identification card, with a vehicle license number for the automobile in which deceased was found. The vehicle license number was that of Charles Williams, 7146 South Harvard. Smith testified that a car was then dispatched to 7146 Harvard in order to bring someone to the location for identification purposes. A woman was brought to the scene, who identified herself as Mary Williams. The body found in the automobile was taken to the County Morgue where it was noted that the deceased had multiple stab wounds in the chest area. The officer stated that he then obtained a photograph of Charles Williams from the Crime Lab and viewed the victim in the Morgue and noted that the picture and the body did not resemble each other. A warrant was then issued for Charles Williams. On cross-examination, Smith identified the sweater, sport coat, and outer coat removed from the victim, and stated that there were holes which may have been stab marks in the sweater, but not in either of the other two outside garments.

Robert Boese, a chemist for the Chicago Police Department, testified for the State. On March 16, 1967, he had occasion to make an investigation of a two-gallon can of a Gardall motor oil. He identified a photograph of the can. Analysis of the liquid contained in the can indicated it was gasoline. On cross-examination, Boese testified that debris found inside the automobile was partially consumed belt wadding and a rug type of fibrous material. Chemical analysis indicated that there was no gasoline on the fibrous materials. During the course of his analysis he did not see a cigarette butt, a cigarette, or a package of matches.

Mary Williams was the next witness testifying on behalf of the State. She stated that she has known Charles Williams since 1965 and identified him in court. She described her relationship with Charles Williams as "common law" and that they had never been married. She stated that she had occasion to meet Seymour Cohen, then an insurance agent with Commonwealth Life Insurance Company, when he was discussing insurance with defendant. Mary Williams stated that she believed defendant took out three life insurance policies, defendant being the insured and herself the beneficiary. She was also the insured on one policy with defendant being the beneficiary. On March 11, 1967, she lived at 7146 South Harvard with her children and defendant. On that day, the police arrived and took her to 130th and Ellis near the expressway. Upon her

arrival she saw defendant's automobile with a man sitting behind the steering wheel. She then informed police that she believed the occupant to be Charles Williams. Later the same day she went to the County Morgue and, after observing the deceased, again stated to the police it was Charles Williams.

She testified that on the evening of March 10, 1967, she had a discussion with defendant in which he stated that "he had found a man that he thought he was going to get some money out of. * * * He said he was going to kill this man, burn him up in his car." He stated he was going to receive the money through insurance. Defendant instructed her to claim the deceased in the automobile as the defendant, Charles Williams. She testified that on at least one other occasion prior to March 10, 1967, defendant had mentioned that he would look for someone to kill in order to receive the insurance money. Later she had occasion to tell the police that "she wasn't a good liar," and then gave the police and Assistant State's Attorney written statements. She testified that she received a telephone call from defendant in which he stated that he heard that Mary Williams had told the police "everything." She stated she subsequently saw defendant when they arrested him and put him in jail, and when she visited defendant in jail, and that on the last occasion defendant asked her to purchase new shoes for him and have them opened in order to place a steel saw in the shoes. She stated that she was a codefendant in the case.

She testified that the person she saw in the automobile and later in the County Morgue was not Charles Williams and she knew it was not at the time she made the previous identification.

On cross-examination she stated that when first taken by the police to observe the automobile and later at the County Morgue, she identified the deceased as Charles Williams, but that she had not told the truth and it was not Charles Williams. She stated that it was a few days later when she told the police the truth concerning the incorrect identification of the deceased. She said that she had ridden in the automobile with defendant on numerous occasions, that defendant kept cans in the automobile, and that she had occasion to clean the automobile after liquids had apparently spilled. She testified that when defendant took three insurance policies out on himself, she in turn took a policy out on herself. The policies on March 10, 1967, were approximately two years old. She stated that she never reported to the police defendant's suggestion that she obtain a shoe with a saw placed in the heel.

On redirect examination she identified People's Exhibit 20 as defendant's wallet.

Detective Jerry Springer, Homicide Unit, Chicago Police Department,

testified that on March 23, 1967, he, Detective Robert Rogers and Richard O'Connell, had occasion to see Charles Williams at the Federal Building in Chicago. While transporting defendant, a conversation occurred between Detective Rogers and defendant in which the latter admitted knowing Arthur Pearson but stating that he did not murder him; that he has life insurance; that he knows Mary Williams, is being framed by her and that she should be in jail. On cross-examination, Officer Springer testified that at no time during his conversation with defendant did he admit to murdering the victim.

Officer Adolph Gary of the Chicago Police Department testified for the State and stated he had occasion to see defendant on March 23, 1967, at the Central Detention lockup. Defendant called Officer Gary over to his cell to say he wanted to talk about the murder. Defendant stated that on the evening of the Pearson murder he was working at the cleaners when he saw some men fighting; that he left the store and saw Pearson lying on the ground; that the victim stated he would like to be taken to Altgeld Gardens; that he aided the victim into his automobile; that he decided to stop at his home first; that he went inside and told his wife, Mary Williams, that he had an injured man in the automobile whom he was taking home. Defendant stated to Officer Springer that his auto became stuck in the shoulder of the road; that the motor stopped; that he poured gasoline into the carburetor. He then returned to the automobile, lit a cigarette, accidentally dropped a match at which time the vehicle burst into flames. He told Springer that he attempted to aid the victim out of the auto but was unable to do so due to the intensity of the flames; that he then caught a bus and returned home. He informed his wife Mary of what had occurred and told her that he was afraid people would not believe that he did not kill the victim. At this time, Mary Williams suggested to defendant that this was an opportunity for them to make some money by defendant pretending that he was the victim and that she would report him as being deceased, give him $45, and he would leave town for Washington, D.C. He stated that on March 22, he returned to Chicago and called Mary Williams, arranged to meet her, and was then arrested.

Dr. Jerry Kearns, pathologist for the Coroner of Cook County, testifying on behalf of the State, stated that his duties for the Coroner's Office include examining dead bodies to determine cause of death. On March 11, 1967, he had occasion to examine the body of Arthur Pearson; the examination consisting of his observation, inspection of the external surfaces and inspection of the internal organs, the trunk, head and neck. The external examination revealed first and second degree burns, blisters, and rawness of the skin, and nine stab wounds in the chest wall.

The internal examination of the lungs revealed they were large, aerated and pinkish red, rather than bluish red which one would expect under ordinary circumstances, indicating some form of asphyxiation. There was a toxicologist's report made on the blood of the deceased which revealed 54 percent concentration of carbon monoxide and 384 milligrams per cent alcohol. No objection was made to this reference to the report. Dr. Kearns testified that based upon his external and internal examination of the victim, the cause of death was the result of "asphyxiation, carbon monoxide intoxication." On cross-examination, he testified that one of the stab wounds on the victim was close to the xyphoid process which resulted in hemorrhaging; there was blood in the abdominal cavity. There were two direct stab wounds that pierced the left cardiac ventricle, and the wounds in the left ventricle ultimately could have been mortal wounds. He stated he was not able to determine the point in time at which the stab wounds occurred and the point in time at which asphyxiation began to take place. He stated that while the stab wounds contributed to the victim's death they were not related to the primary cause of death.

Defendant Charles Williams took the witness stand and testified in his own defense. He stated that prior to his incarceration he was living with his common-law life, Mary Williams, for approximately two years. On the evening of March 10, 1967, he was employed by a cleaning establishment located at 704 East 43rd Street. While at work defendant was informed by another employee of an altercation occurring beside an automobile owned by Mary Williams and defendant. Upon going outside, defendant observed a man laying on the hood of his automobile and several people around the vehicle. He stated that he ran to the automobile and observed 16 or 17 people milling about the vehicle. He then observed the man on the hood of the vehicle being beaten by another person and intervened in order to stop the man attacking the person on the automobile. The crowd dispersed and the injured victim asked defendant to take him to his home. Defendant placed the victim in his vehicle and returned to the shop to pick up his coat and jacket, which he then placed over the victim. The weather was cold and defendant was initially unable to start the engine. Defendant stated he had had difficulty with the automobile on prior occasions, including its stopping and catching fire, which resulted in it being rewired and the carburetor fixed. Defendant went to the trunk of his automobile where he kept a yellow Gardall can of gasoline, and then to the front of the vehicle where he poured the gasoline over the carburetor. The engine started and defendant placed the can in the back seat. Defendant testified that he then proceeded to the vicinity of 80th or 90th Street where

he stopped the vehicle to care for the occupant, placing his outer garments over the injured person and assisting him into the front seat. He then proceeded onward. Upon reaching 130th Street defendant prepared to exit, pulling off the road and onto the shoulder where the wheels became stuck. The vehicle stalled. While defendant attempted to flag down passing motorists for assistance, he heard an explosion in the vehicle and observed it in flames. He returned to the automobile and attempted to rescue the occupant from the passenger side door which he had previously locked. He then turned to the driver side of the vehicle where flames were coming from, and burned his mustache and eyebrows. He stated that he was also unable to open the driver's door of the vehicle, and that he then ran down the road and stopped a bus, which he traveled on until reaching his home. Upon reaching his home, defendant informed his wife of the accident in which a passenger was burned. Defendant's wife informed him that if he would telephone the police to explain the incident he would be incarcerated, and then suggested that defendant leave town and allow her to explain the occurrence to the police. Following the discussion with Mary Williams, defendant left and proceeded by bus to Washington, D.C.

Defendant testified to telephoning Mary Williams from Washington, D.C., and to a conversation in which she stated that she was unable to learn any of the details concerning the incident, and that she had informed the police that defendant was the burned person found in the vehicle. Defendant asked her why she made these statements and Mary Williams responded that she was threatened, afraid and that the police were harassing her. Defendant was subsequently unable to reach Mary Williams and, upon telephoning his former employer, was informed that Mary Williams had been arrested and incarcerated. Defendant subsequently contacted Mary Williams by telephone and was informed that a warrant had been issued for his arrest and suggested that defendant return to Chicago and straighten the matter out with the authorities. Defendant then returned to Chicago and was apprehended by the police. Defendant testified that after being arrested, he had a conversation with Detective Gary in which he stated the same information he had testified to in court. Defendant testified he was approached by an individual concerning the purchase of life insurance apparently two years before the incident alleged in the indictment, and that Mary Williams had used the same agent in previous transactions. Mary Williams instructed defendant to sign his name to certain papers, and he did not know the amount of the policy. Defendant denied killing Arthur Pearson.

On cross-examination, Williams testified that he never made any

previous payments on the insurance policies, that he never gave Mary Williams any money specifically designated for premium payments, and never knew whether Mary Williams was paying the premiums for the insurance policies. Defendant identified his wallet and denied placing it in the victim's right rear pocket, denied the victim took the wallet from him, and didn't know how the victim acquired it.

OPINION

On appeal, defendant contends that references of a medical expert for the State to a toxicologist's report upon which he based his opinion that the deceased died as a result of asphyxiation, and not as the result of stab wounds, severely prejudiced the defendant's case, was inadmissible hearsay, and denied defendant his constitutional right to confrontation of witnesses. Specifically, defendant objects to the following statements by Dr. Kearns, a medical expert testifying on behalf of the State:

"Q. Now, Doctor, was there a toxicologist's report made on the blood of the deceased?

A. There was.

Q. What, if anything, did that reveal?

A. This revealed fifty-four per cent concentration of carbon monoxide, three-hundred and eighty-four milligrams per cent ethenol or alcohol, the drinking alcohol, so to speak.

Q. Now, Doctor, based on your external and internal examination of Arthur Pearson and based upon your experience as a pathologist and your training and education, do you have an opinion as to the cause of death of Arthur Pearson?

A. I do.

Q. Doctor, would you please tell the Court and Counsel for the defense what that opinion is.

A. In my opinion, the death of Arthur Pearson was the result of asphyxiation, carbon monoxide, intoxication."

Defendant submits that the trial court erred in permitting the examining pathologist to testify to the results of the toxicologist's report on an analysis of the blood of the deceased, and, based upon the information contained in that report, gave his opinion that the victim's cause of death was from asphyxiation, and not from the stab wounds that he had incurred.

Defendant relies principally upon *People v. Williams*, 337 Ill. 371, 169 N.E. 190, and *People v. Capoldi*, 10 Ill. 2d 261, 139 N.E.2d 776, to support the proposition that expert testimony of physicians as to cause of death based on unauthenticated documents or on the work of others is hearsay and inadmissible. In *Williams*, a coroner's physician testified

at defendant's murder trial from an x-ray picture and from hospital records as to the cause of death of the victim. He testified that he did not make an autopsy; that other doctors removed the bullet; and that he made no post-mortem examination of the body himself. On cross-examination he stated that he received his information as to cause of death ' "From the records of the hospital.' " Our Supreme Court reversed the conviction, concluding that the testimony of the coroner's physician, when given from records of the hospital without proof of their authenticity, was inadmissible hearsay, and that the physician's testimony concerning matters disclosed by the x-ray was inadmissible because no ground for such testimony had been laid.

In *Capoldi,* a psychiatrist appearing as a witness on behalf of the State, was permitted to testify in a hearing under the Sexually Dangerous Persons Act that, according to certain records defendant had a history of attacking his sister and that defendant's mother was concerned about him and stated she would like to have him sent to an institution. On appeal, our Supreme Court held the testimony as inadmissible hearsay which should have been excluded.

We find the facts at bar clearly distinguishable from those in *Williams* and *Capoldi.* In *Williams,* the coroner's physician testified that his information as to the victim's cause of death came "From the records of the hospital," after admitting that he neither performed the autopsy, removed the bullet, nor performed a post-mortem examination of the body himself. In *Capoldi,* no evidence was adduced that the expert witness had any contact with or performed any examinations on the defendant, or that defendant had made any statements to the witness. The psychiatrist's knowledge in support of his testimony appeared to be based exclusively on certain records. In the instant case, Dr. Kearns testified that he personally performed an examination of the victim, including observation and inspection of the external surfaces and internal organs, the trunk, head and neck. Immediately prior to the above colloquy alleged as error by defendant, the witness testified that his internal examination of the lungs revealed that:

> "The lungs were quite large, aerated, and the cut surfaces were pinkish red rather than bluish red, which one would expect under ordinary circumstances, which would suggest some form of asphyxiation."

Thus, the expert witness' conclusion that the victim's cause of death was asphyxiation was founded, in most part, upon his own personal internal examination of that victim. Defendant's contention that the witness based his opinion as to cause of death principally upon the toxicologist's report is not borne out by a review of the record. The expert witness testified

to the internal and external examination that he personally performed, and based his opinion as to cause of death upon these examinations, as well as his experience as a pathologist, his training and his education. We therefore conclude that the reference by Dr. Kearns to a toxicologist's report to which no objection was made was at most harmless in light of the witness' testimony that his internal examination of the victim's lungs clearly supported his opinion that the victim's cause of death was asphyxiation. Error in the admission of evidence is harmless when the facts involved are established by other competent evidence. *People v. Montgomery*, 271 Ill. 580, 111 N.E. 578.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

DRUCKER and SULLIVAN, JJ., concur.